## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VERN McKINLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:10-cv-00751 (ABJ) |
| | ) |
| BOARD OF GOVERNORS OF | ) |
| THE FEDERAL RESERVE SYSTEM, | ) |
| | ) |
| Defendant. | ) |
| | ) |

### MEMORANDUM OPINION

This action involves two requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2006), made by plaintiff Vern McKinley ("McKinley"), seeking documents related to deliberations undertaken by the Board of Governors of the Federal Reserve System ("Board") concerning what systemic effect, if any, the failure of American International Group ("AIG") and Lehman Brothers might have on financial markets.  McKinley seeks a declaratory judgment that the Board violated FOIA by failing to fulfill his requests for non-exempt responsive records and an injunction compelling the Board to comply with the FOIA requests. Compl. ¶¶ 14–15.  The parties have cross-moved for summary judgment [Dkt. # 13, 17, and 19]. Because the Court finds that the Board conducted adequate searches and properly invoked FOIA exemptions, the Court will grant both of the Board's motions for partial summary judgment [Dkt. # 13 and 17] and will deny McKinley's cross-motion [Dkt. # 19].

### I.      Background

The Federal Reserve System is composed of the Board and twelve regional Federal Reserve Banks ("FRBs").  The Board is the central supervisory authority of the Federal Reserve

System.  12 U.S.C. § 241 (2006).  It oversees the operation of the system, promulgates and administers regulations, and plays a major role in the supervision and regulation of the United States banking system.  The Board is "authorized and empowered … (1) [t]o examine at its discretion the accounts, books, and affairs of each Federal reserve bank and of each member bank and to require such statements and reports as it may deem necessary" and (2) "[t]o require any depository institution specified in this paragraph to make, at such intervals as the Board may prescribe, such reports of its liabilities and assets as the Board may determine to be necessary or desirable to enable the Board to discharge its responsibility to monitor and control monetary and credit aggregates."  12 U.S.C. § 248 (2006).  Most pertinent to this case, section 13(3) of the Federal Reserve Act, as it was in effect in 2008, gives the Board the power to authorize, in unusual and exigent circumstances, any FRB to extend credit to any individual, partnership, or corporation that is secured to the satisfaction of the lending FRB and meets other specified criteria.  12 U.S.C. § 343 (2008), *amended by* Pub. L. No. 111–203, § 1101(a), 124 Stat. 2113 (2010).  However, before the Board may authorize a FRB to make a loan, the FRB must make an independent determination concerning whether adequate credit is available from other banking institutions and whether the target institution has sufficient lendable collateral to support a loan of the magnitude required to meet its expenses.  Mosser Decl. ¶ 7.

**A. The Board's Response to the Financial Crisis and the Worsening Liquidity Problems of AIG and Lehman Brothers.**

AIG and Lehman Brothers were among several institutions facing severe capital and liquidity problems toward the end of 2008.  Thro Decl. ¶ 11.  At that time, the Board became increasingly concerned about the effects that a possible AIG or Lehman Brothers bankruptcy would have on financial markets and individual financial institutions, including on large complex banking organizations ("LCBOs").  Foley Decl. ¶ 6.  As a result, the Board undertook to

2

determine whether or not to authorize the Federal Reserve Bank of New York ("FRBNY") to extend a loan to either or both institutions under section 13(3) of the Federal Reserve Act. In making this determination, the Board sought information from the FRBNY concerning the real-time exposures of certain counterparties to AIG and Lehman Brothers.[1]  *Id.*  In addition to the information supplied by FRBNY examiners, the Board also exchanged information with domestic and foreign banking supervisors to assess the potential impact of AIG's and Lehman Brothers' funding difficulties on regulated financial institutions and markets. *Id.*

Over the weekend of September 13, 2008, the Board, FRBNY, U.S. Department of the Treasury, and Securities and Exchange Commission brought together leaders of major financial firms in an attempt to craft a private sector solution to address Lehman Brothers' worsening capital and liquidity shortfalls.  Thro Decl. ¶ 11.  No solution could be crafted and Lehman Brothers declared bankruptcy on September 15, 2010.  *Id.*  "Convinced," however, "that the failure of AIG would be catastrophic for a financial system already in acute distress," the Board invoked section 13(3) and authorized the FRBNY to loan up to $85 billion to AIG.  Mosser Decl. ¶ 6.  The FRBNY, in turn, approved the loan.  *Id.*

## B.  The FOIA Requests

McKinley made two separate but related FOIA requests that give rise to this action.  On March 21, 2010, McKinley submitted his first request (the "AIG request") to the Board seeking "further detail on information contained on p. 3 of the [September 16, 2008] minutes of the

---

1       Under authority delegated by the Board, the FRBNY supervises Large Financial Institutions ("LFIs"), including financial utilities, that are members of the Federal Reserve System.  Davis Decl. ¶ 2.  All LFIs supervised by the FRBNY are subject to continuous on-site monitoring by a team of FRBNY examiners who continually gather and analyze information as part of the bank examination process.  *Id.*  FRBNY examiners request information from regulated LFIs on a wide range of subjects to assess the LFI's exposure to particular market participants or sectors in order to assess risks to the institution from market events, and to craft an appropriate supervisory response.  *Id.*

Board of Governors of the Federal Reserve[.] . . . The source of power referenced in the minutes is Section 13(3) of the Federal Reserve Act." Ex. A to Thro Decl. McKinley specifically sought "any and all communications and records concerning or related to the Board's decision that detail that 'the disorderly failure of AIG was likely to have a systemic effect on financial markets that were already experiencing a significant level of fragility'" as described in the meeting minutes. *Id*. The following week, McKinley submitted his second request (the "Lehman request") to the Board seeking:

> [A]ny and all communications and records regarding analysis undertaken regarding Lehman Brothers and the assessment in September 2008 or earlier of what 'contagion' might have flowed from Lehman Brother's filing of bankruptcy as the word contagion was used in the case of the Board of Governors' deliberations over Bear Stearns: or 'systemic effect on financial markets' that might have flowed from a Lehman Brothers bankruptcy as those terms were used in the Board's deliberations over American International Group.

Ex. E to Thro Decl. "Th[is] analysis," McKinley asserts in his request, "would likely have been undertaken in the context of considering whether to take action under Section 13(3) of the Federal Reserve Act to avoid a Lehman bankruptcy." *Id*.

The Manager of the Freedom of Information Office at the Board acknowledged receipt of the AIG request on March 22, 2010 and the Lehman request on March 30, 2010. Thro Decl. ¶ 4, 8. On May 11, 2010, prior to the Board's review and release of the responsive documents, but after the statutorily prescribed waiting period for filing a FOIA action had expired, McKinley brought this suit. McKinley alleges a "violation of FOIA" as the sole count and seeks to compel the Board "to search for and produce" any and all non-exempt responsive records, and to enjoin the Board from "continuing to withhold" any and all non-exempt records responsive to the FOIA requests. Compl. ¶¶ 13-15.

Beginning in August 2010, attorneys at the Board conducted searches to identify any and all records responsive to McKinley's requests. Thro Decl. ¶¶ 15, 22. On November 9, 2010, the Secretary of the Board informed McKinley that staff had searched Board records, and had found a large number of documents responsive to the AIG and Lehman requests.[2] *Id.* ¶ 6, 10. In total, the Board released 2,388 pages of responsive documents to McKinley, with 575 pages provided in full, 751 pages provided in part, and 1062 pages withheld in full.[3] *Id.* The Board claims that the 751 pages provided in part and 1062 pages withheld in full contain exempt information subject to withholding under FOIA Exemptions 2, 4, 5, 6, or 8.[4] *Id.*

The Board filed motions for partial summary judgment on June 8, 2011 and on July 15, 2011 [Dkt. # 13, 17]. McKinley cross-moved for summary judgment on August 31, 2011 [Dkt. # 19]. McKinley challenges the adequacy of the Board's searches and maintains that the Board continues to improperly withhold information in eighty-three records. Specifically, McKinley

---

2       The Board produced an AIG Vaughn Index and a Lehman Vaughn Index identifying the withheld material by document (rather than page), briefly describing the withheld material and listing the FOIA exemption pursuant to which the document was withheld. *See Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973). For the AIG request, the Board provided McKinley with an index bearing bates numbers with the prefix "BOG–FOIA 10–251" and running from 000001 to 001134. Thro. Decl. ¶ 6. For the Lehman request, the Board provided McKinley with an index bearing bates numbers with the prefix "BOG–FOIA 10–267" and running from 000001 to 001254. *Id.* ¶ 10. Pursuant to the Court's February 3, 2012 Minute Order, the parties submitted a joint statement containing an index of the disputed records, catalogued by bates number, and with reference to the Board's claims of exemption for each record [Dkt. # 23].

3       The 2,388 pages of responsive documents includes: 1133 pages of documents responsive to the AIG request and released on November 9, 2010; one page of documents responsive to the AIG request and released on May 27, 2011; 1221 pages of documents responsive to the Lehman request and released on November 9, 2010; and 33 pages of documents responsive to the Lehman request and released on May 27, 2011.

4       As an initial matter, McKinley does not challenge any of the Board's withholdings under Exemptions 2 or 6. As such, the Court will not address these records. *See* Pl.'s Reply at 2 (stating that the exemptions currently at issue are Exemptions 4, 5, and 8).

asserts that the Board has improperly withhold seventeen records because they are readily-available to the public, and challenges the withholding of sixty-six records as improper under the Board's asserted FOIA exemptions.   The Board contends that the searches conducted were adequate and that it is entitled to withhold the eighty-three disputed records under applicable FOIA exemptions.

## II.     Standard of Review

"FOIA cases are typically and appropriately decided on motions for summary judgment." *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009).   In the FOIA context, "the sufficiency of the agency's identification or retrieval procedure" must be "genuinely in issue" in order for summary judgment to be inappropriate.  *Weisberg v. DOJ*, 627 F.2d 365, 370 (D.C. Cir. 1980), quoting *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979) (internal quotation marks omitted).   However, a plaintiff "cannot rebut the good faith presumption" afforded to an agency's supporting affidavits "through purely speculative claims about the existence and discoverability of other documents."  *Brown v. DOJ*, 742 F. Supp. 2d 126, 129 (D.D.C. 2010), quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citations omitted).

In any motion for summary judgment, the Court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence."  *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).   However, where a plaintiff has not provided evidence that an agency acted in bad faith, "a court may award summary judgment solely on the basis of information provided by the agency in declarations."  *Moore*, 601 F. Supp. 2d at 12.   The district court reviews the agency's

action de novo, and "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B) (2006); *accord Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).

### III.     Analysis

The purpose of FOIA is to require the release of government records upon request and to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). At the same time, Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused." *FBI v. Abramson*, 456 U.S. 615, 621 (1982); *see also Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003) ("FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential."). The Supreme Court has instructed that FOIA exemptions are to be "narrowly construed." *Abramson*, 456 U.S. at 630.

To prevail in a FOIA action, an agency must satisfy two elements. First, the agency must demonstrate that it has made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "[A]t the summary judgment phase, an agency must set forth sufficient information in its affidavits for a court to determine if the search was adequate." *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), citing *Oglesby*, 920 F.2d at 68. Such agency affidavits attesting to a reasonable search "are afforded a presumption of good faith," *Defenders of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004) ("*Defenders of Wildlife I*"), and "can be rebutted

only 'with evidence that the agency's search was not made in good faith,'" *id.*, quoting *Trans Union LLC v. Fed. Trade Comm'n*, 141 F. Supp. 2d 62, 69 (D.D.C. 2001).  Second, an agency must show that "materials that are withheld . . . fall within a FOIA statutory exemption." *Leadership Conference on Rights v. Gonzales*, 404 F. Supp. 2d 246, 252 (D.C. Cir. 2005).

### A.  Whether The Board Conducted Adequate Searches.

McKinley first argues that the searches performed by the Board were not adequate.  Pl.'s Cross–Mot. at 3.  "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999), quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).  "To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91 (D.D.C. 2009) ("*Defenders of Wildlife II*").  However, "the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  The process of conducting an adequate search for documents requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise" and is "hardly an area in which the courts should attempt to micromanage the executive branch." *Schrecker v. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003) (internal quotation marks and citations omitted).

The Board argues that it performed an adequate search because it thoroughly searched materials in the Project Collect Repository, which was created to hold materials related to the Federal Reserve's response to the financial crisis.  McKinley does not argue that the search of the repository was itself inadequate, but instead argues that the Board was required to search at

the FRBNY in addition to searching the repository.  Pl.'s Cross–Mot. at 4.  The Court agrees with the Board that the Board was not required to search beyond the repository in order to satisfy its FOIA obligation to conduct an adequate search.

### 1.  The Project Collect Repository

Public interest in the AIG loan and Lehman Brothers' bankruptcy prompted the Board's General Counsel to direct "Legal Division staff to gather all materials related to the AIG loan and Lehman Brothers bankruptcy, among other topics, as part of a larger effort to collect documents related to the Federal Reserve's response to the financial crisis, known as Project Collect."  Thro Decl. ¶ 12.  The Project Collect repository contains hundreds of thousands of documents collected from approximately 190–200 Board members, officers, and staff in nine divisions who were involved in any aspect of the Board's response to the financial crisis.  *Id.* ¶ 13.  To create the repository, Legal Division staff contacted "those involved in the response to Lehman Brothers' capital and liquidity crisis as well as those involved in the response to AIG's liquidity crisis and request for the AIG loan."  *Id.*  In particular, staff "sought all documents relating to AIG from January 1, 2008 through the date of collection and all documents relating to Lehman Brothers from January 1, 2008 through the date of collection."  *Id.*  Board members, officers, and staff were informed of FOIA and Congressional requests for information that the Board had received and were asked to forward any potentially responsive documents for inclusion in the Project Collect repository.  *Id.*

### 2.  The Board's Search of the Project Collect Repository was Adequate

McKinley argues that the Board conducted inadequate searches because it "failed to search records [located] at the FRBNY."  Pl.'s Cross–Mot. at 4.  He argues this not because he disputes that the FRBNY is not a component of the Board, but because he believes that "certain

records of FRBNY are nevertheless agency records." *Id.* But, even if the Court were to agree

with McKinley on that point, any records that remain at the FRBNY and not in the Project

Collect repository – to the extent that such records exist – are beyond the scope of McKinley's

FOIA requests.[5] McKinley's AIG request asked only for records "concerning or relating to *the*

*Board's decision* that detail that 'the disorderly failure of AIG was likely to have a systemic

effect of financial markets . . . .'" Ex. A to Thro Decl. (emphasis added). So the FRBNY cannot

possess any of the materials that fall within this request because the records that the FRBNY has

in its possession are records that the FRBNY consulted in deciding what information to send to

the Board. These records are thus not related to *the Board's decision*, and therefore do not fall

within McKinley's request. The only records that do fall within McKinley's request are

possessed by the Board and, as the Thro declaration explains, were put in the Project Collect

repository. *See* Thro Decl. ¶¶ 12–14 (explaining that at the time the Board began the search and

---

5       Because McKinley's request seeks only records contained in the repository, the Court
need not determine under what circumstances, if any, records created by the FRBNY pursuant to
its independent lending authority, may constitute records created "on behalf of" the Board,
subject to disclosure under FOIA. Even if the Court were to find such records and in fact "Board
records," however, FOIA reaches only records that the agency *controls* at the time of the request.
*DOJ v. Tax Analysts*, 492 U.S. 136, 144–45 (U.S. 1989). Control means "the materials have
come into the agency's possession in the legitimate conduct of its official duties," *id.*, and is
determined with regard to the four factors outlined by the D.C. Circuit in *Burka*, *see Burka v.
U.S. Dep't of Health and Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996). However, "use [of
the record] is the decisive factor" in deciding whether the agency controls a record under FOIA.
*Judicial Watch v. FHFA*, 646 F.3d 924, 928 (D.C. Cir. 2011) (holding that "where an agency has
neither created nor referenced a document in the conduct of its official duties, the agency has not
exercised the degree of control required to subject the document to disclosure under FOIA")
(internal quotation marks and citations omitted). "[A] document that could reveal nothing about
agency decisionmaking is not an agency record" within the meaning of FOIA. *Id.* (internal
quotation marks omitted). Because the Board could not possibly make use of records that it
*never* consulted, the Court finds that such records can reveal nothing about its deliberative
process and disclosure would do nothing to advance the "core purpose of FOIA," which is to
"'contribut[e] significantly to public understanding *of the operations or activities of the
government*.'" *Id.*, quoting *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749,
775 (1989) (emphasis in original).

identification process for McKinley's FOIA requests, the Project Collect repository "contained Board records from August 2007 to May 2009 and beyond relating to the Federal Reserve's response to the financial crisis, including the AIG loan and the Lehman Brothers bankruptcy.").

And the Lehman request directs the Board to produce records regarding analysis "undertaken in the context of considering whether to take action under Section 13(3) of the Federal Reserve Act" as to Lehman Brothers.  Ex. E to Thro Decl.  Since the Board was the only body that considered whether to take action under Section 13(3) of the Federal Reserve act – not the FRBNY – the request refers only to information that the Board itself considered, which again is contained entirely in the Project Collect repository.  *See* Thro Decl. ¶¶ 12–14; *see also* Pl.'s Reply at 1, 2 (characterizing his own requests as:  "Specifically, McKinley sought all records relating to the information *relied upon or used by the Board* when it decided to authorize the Federal Reserve Bank of New York ("FRBNY") to extend credit to the American International Group ("AIG") as well as the information it relied upon or used when it determined that it would not authorize the FRBNY to extend credit to Lehman Brothers") (emphasis added).

The Court therefore concludes that the scope of the information compiled in the Project Collect repository is sufficiently broad to reasonably capture all Board records that are responsive to McKinley's request.

The Board has submitted affidavits to the Court "explain[ing] in reasonable detail the scope and method of the agency's search,"[6] *Defenders of Wildlife II*, 623 F. Supp. 2d at 91. Because in the absence of contrary evidence, agency declarations are given a presumption of

---

6      In support thereof, the Board submitted a 25 page affidavit from Allison Thro ("Thro"), a senior counsel in the Board's Legal Division who is primarily responsible for processing requests for information the Board receives under FOIA, including performing the search for responsive records and determining which records should be redacted, withheld, or disclosed. Thro Decl. ¶ 1.

good faith and are generally sufficient to demonstrate an agency's compliance with its obligations under FOIA, *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982), and because McKinley does not dispute that the Board conducted adequate searches of the Project Collect repository, the Court concludes that the Board's search of the Project Collect repository was "reasonably calculated to uncover all relevant documents," *Valencia–Lucena*, 180 F.3d at 325 (internal quotation marks and citations omitted).

### B.  Whether the Board Properly Withheld the Eighty-Three Records in Dispute

Finding the Board's searches to be adequate, the Court next addresses whether the eighty-three responsive records that were not produced in full were properly redacted or withheld under the Board's claimed FOIA exemptions.

When Congress enacted FOIA, it "set forth a policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to the functioning of a democratic society." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir 1992) (en banc), quoting *FBI v. Abramson*, 456 U.S. at 621 (citations omitted).  "At the same time, however, 'Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information.'" *Id.*, quoting *Abramson*, 456 U.S. at 621. "Balancing these private and public interests, Congress enacted nine exemptions to FOIA." *Id.*

When an agency seeks to withhold a document from disclosure, it must specify the exemption claimed and explain why it is entitled to claim it.  The agency bears the burden of justifying the decision to withhold records under FOIA's statutory exemptions.  *See* 5 U.S.C. § 552(a)(4)(B).  A court may grant summary judgment based solely on information provided in an agency's affidavits or declarations if they "describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld

logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Casey*, 656 F.2d at 738.  Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc.*, 926 F.2d at 1200 (internal quotation marks and citations omitted).  Although an agency may be entitled to summary judgment based solely on information in its affidavits or declarations, a court may also conduct an *in camera* review of disputed records.[7]  *See Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978).  However, an agency waives its right to claim a FOIA exemption for information that it has officially released in the public domain.  *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999).

McKinley alleges that the Board continues to improperly redact or withhold eighty-three records.  His challenges fall into four categories:[8] (1) records that are available in the public domain; (2) records redacted or withheld under Exemption 4; (3) records redacted or withheld

---

[7]     Although the Board is entitled to summary judgment on the basis of its uncontroverted declarations alone, the Court conducted an *in camera* review of the eighty-three disputed records.  The Court finds that the Board's declarations accurately explain in reasonable detail the nature of the information redacted or withheld from disclosure; that such information was properly redacted or withheld under the claimed exemptions; and that the Board made a good faith effort to segregate exempt information from non-exempt information and to disclose all non-exempt information reasonably responsive to McKinley's requests.

[8]     Because the Board has claimed multiple exemptions for certain records, and because McKinley has not challenged every exemption claimed for each record, there is some disparity between the total number of challenges and the total number of redacted or withheld records.  The Court examines each of McKinley's challenges, but treats unchallenged exemptions as conceded.  *See Fischer v. DOJ*, 723 F. Supp. 2d 104, 110 (D.D.C. 2010) (treating the defendant's arguments as conceded under several FOIA exemptions because the plaintiff did not address the arguments in its opposition); *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp.2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

under Exemption 5; and (4) records redacted or withheld under Exemption 8.  The Court addresses each in turn.

      1.  <u>Records Available in the Public Domain</u>

McKinley challenges the withholding of seventeen records on the grounds that the Board has waived its FOIA Exemptions because the records have been published by the Financial Crisis Inquiry Commission ("FCIC") and appear in the public domain.  Pl.'s Opp. at 7–8. McKinley does not challenge the fact that the records fall within a valid exemption;[9] instead, he argues that records normally exempted from disclosure "lose their protective cloak once disclosed and preserved in a permanent public record."  *Id.* at 7.  The Board does not dispute that the records at issue have been posted by the FCIC on its public website, but it maintains that the publication does not waive the Board's FOIA Exemptions because the records were provided to the FCIC under a written confidentiality agreement that did not authorize public disclosure. Def.'s Reply at 11.

Under the public domain theory, the "Government waives its right to invoke an otherwise applicable exemption to the FOIA when <u>it</u> makes an 'official and documented' disclosure of the information being sought."  *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999), quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) (emphasis added).  To be "official," the release must have been by "the agency from which the information is being sought."  *Id.* Disclosures to Congress are not official disclosures within the meaning of FOIA and do not waive an agency's FOIA Exemptions.  *Murphy v. Dep't of the Army*, 613 F.2d 1151, 1155–59 (D.C. Cir. 1979); *see also Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 603–04 (D.C. Cir. 2001)

---

9     As such, the waiver issue is dispositive to the question of whether these seventeen records are subject to release.

(noting that the rule applies with even greater force when the agency took steps to preserve the confidentiality of the information provided to Congress).

Here, the Board asserts and McKinley does not dispute that it provided sixteen of the seventeen records in question to a Congressional committee under a written confidentiality agreement and that the seventeenth record was not provided to the FCIC at all.  Def.'s Reply at 13 & n.15.  Contrary to McKinley's claim, and in accordance with the law of this Circuit, the mere fact that the committee subsequently, and without authorization, published the records does not constitute a waiver of the Board's FOIA Exemptions.  To hold otherwise would frustrate "public policy [encouraging] broad congressional access to governmental information" because agencies "would invariably become more cautious in furnishing sensitive information to the legislative branch."  *Murphy*, 613 F.2d at 1156.  As such, the Court finds that the Board has not waived its FOIA exemptions to the seventeen records published by the FCIC.

### 2.  Records Redacted or Withheld Under Exemption 4

McKinley next challenges the Board's withholding of four records under FOIA Exemption 4.[10]  FOIA Exemption 4 prohibits disclosure of "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  In this Circuit, the terms "commercial" and "financial" are given their ordinary meanings.  *See Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002).  "Commercial" is defined broadly to include "records that reveal basic commercial operations or relate to income-producing aspects of a business" as well as situations where the "provider of the

---

10      The bates numbers for the four records withheld under Exemption 4 are: 10-251-000847; 10-267-000349-353; 10-267-000799; and 10-267-001172.   McKinley does not address the Board's Exemption 4 arguments for records 10-267-000756-757, 10-267-000782 and 10-267-001117, so the Court treats these arguments as conceded.  *See Fischer*, 723 F. Supp. 2d at 110; *Hopkins*, 284 F. Supp. 2d at 25.

information has a commercial interest in the information submitted to the agency." *Baker & Hostetler, LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (internal quotation marks omitted).  Banks and other financial institutions are considered "persons" for the purposes of the exemption. *See* 5 U.S.C. § 551(2).

Whether commercial or financial information is protected turns in part on whether it was provided to the government voluntarily or under compulsion:  if the financial or commercial information was disclosed to the government voluntarily, it will be considered confidential for purposes of Exemption 4 if it is the kind of information "that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass*, 975 F.2d at 879.  If the information was required, however, it will be considered confidential only if disclosure would be likely either (1) "to impair the government's ability to obtain necessary information in the future"; or (2) "to cause substantial harm to the competitive position of the person from whom the information was obtained."  *See id.* at 878–84, reaffirming and quoting test of *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974), but confining it to cases of compelled disclosure).

a.   Voluntarily Provided Information

The Board asserts that two of the four challenged records are properly withheld under the *Critical Mass* standard because they contain voluntarily provided commercial or financial information that would not ordinarily have been made public. *See Critical Mass*, 975 F.2d at 879.  McKinley agrees that *Critical Mass* governs, but alleges that the Board has failed to demonstrate that the withheld records contain information that would not ordinarily have been

made public.   McKinley's argument is purely speculative,[11] however, and the Board's uncontroverted declarations describe the records and the justifications for nondisclosure with reasonable detail.

Record 10-251-000847 is an email regarding the "severity of AIG's capital hole" and contains the "identity of [an] outside analyst."  Thro. Decl. at 108.  This "confidential market source[] . . . would not customarily disclose to the public that they had provided information to Board or FRBNY staff."  *Id*. at 45.  And record 10-267-001172 is an email exchange containing "confidential commercial or financial information regarding Lehman's foreign operations supplied voluntarily by foreign bank supervisory agencies," *id*. at 204, and includes "details on briefings of . . . foreign bank supervisors regarding Lehman."  Parkinson Decl. ¶ 15.  The Board asserts that "disclosure of this information likely would impair the Board's ability to obtain necessary information in the future as foreign bank supervisory agencies would be unlikely to provide information if they knew that it would be disclosed to the public.  Thro. Decl. at 204.

### b.  Involuntarily Provided Information

The Board asserts that the two remaining records are properly withheld under the *National Parks* standard because they contain involuntarily provided commercial or financial information, disclosure of which would likely either (1) "impair the government's ability to obtain necessary information in the future"; or (2) "cause substantial harm to the competitive position of the person from whom the information was obtained."  *See National Parks & Conservation Ass'n*, 498 F.2d at 770.  McKinley alleges that the Board has failed to justify

---

11     For example, McKinley claims that "viewing the disclosed portion" of record 10-267-001172 "suggests the [undisclosed] material" of that record is likewise subject to disclosure. Pl.'s Cross–Mot. at 25.  The Court rejects this line of reasoning as speculative at best.

nondisclosure under *National Parks*.  Again, however, McKinley's allegations are speculative,[12] and the Board's uncontroverted declarations describe the records and the justifications for nondisclosure with reasonable detail.

Record 10-267-000349-353 is a spreadsheet that provides counterparties' exposure to Lehman.  Ex. I to Thro. Decl. at 43.  The Board asserts that "[p]rovision of this information was mandatory" and that "[d]isclosure is likely to cause substantial competitive injury to financial institution(s) or impair the Board's ability to obtain similar, necessary information in the future by diminishing the quality or reliability of information provided."  Ex. I to Thro. Decl. at 23.  Similarly, record 10-267-000799 is an email "conveying information obtained by examiners regarding those institutions' exposure to Lehman Brothers and steps taken by those institutions in response to Lehman Brothers' capital and liquidity shortages."  Foley Decl. ¶ 8.  The Board contends that "these regulated financial institutions provided this information to FRB examination staff on the understanding that it would remain confidential, and would be used for supervisory purposes" and that  "[d]isclosure of this information would have a chilling effect on the exchange of information between the Board or FRBs and regulated financial institutions."  *Id*.

### c.  Exemption 4 Findings

In light of these uncontroverted declarations, which "are accorded a presumption of good faith [that] cannot be rebutted by purely speculative claims," *SafeCard Servs., Inc.*, 926 F.2d at 1200, the Court finds that the Board has "demonstrate[d] that the information withheld logically

---

12      For example, McKinley claims that the Board cannot justify withholding record 10-267-000349-353 in full because another record, described similarly in the Vaughn index, was merely redacted.  Pl.'s Cross–Mot. at 20.  He reasons that if the information "was harmless enough" to produce in one record, then it should be harmless enough to produce in another record.  *Id*.  This argument is purely speculative.

falls within [Exemption 4]."  *Casey*, 656 F.2d at 738.  McKinley points to no evidence in the record that would controvert the Board's declarations, nor any evidence of agency bad faith.  *See Id.*  Furthermore, *in camera* review of the disputed records confirms the declarations proffered on behalf of the Board.  As such, the Court holds that records 10-251-000847, 10-251-000349-353, 10-267-000799 and 10-267-001172 were properly redacted or withheld under FOIA Exemption 4.  McKinley's request to produce them will be denied.

### 3.  Records Redacted or Withheld Under Exemption 5

McKinley next challenges the Board's withholding of sixty-two records under FOIA Exemption 5.[13]  FOIA Exemption 5 provides agencies with the authority to deny FOIA requests where the requested documents include "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  In determining whether a document was properly withheld under Exemption 5, a court must determine that the document satisfies two conditions:  "its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

---

13    The bates ranges for the sixty-two records withheld under Exemption 5 are: 10-251-000071; 10-251-000127; 10-251-000078; 10-251-000083; 10-251-000092–93; 10-251-000103; 10-251-000104; 10-251-000135; 10-251-000141–146; 10-251-000172–180; 10-251-000753–764; 10-251-000261; 10-251-000518; 10-251-000860; 10-251-000848; 10-251-000854; 10-251-000855; 10-251-000857; 10-251-000858; 10-251-000865; 10-251-000891; 10-251-000895; 10-251-000941–943; 10-251-000957–959; 10-251-000869; 10-251-000871; 10-251-000893; 10-251-000898–899; 10-251-000911–912; 10-251-000903; 10-251-000955; 10-251-000964; 10-251-000965; 10-251-001119–1120; 10-251-001121–1123; 10-251-001124–1125; 10-251-001126–1128; 10-251-001131; 10-251-001132; 10-251-001133; 10-251-001134; 10-267-000373; 10-267-000422–424; 10-267-000425–428; 10-267-000616–617; 10-267-000618; 10-267-000619–621; 10-267-000756–757; 10-267-000771–772; 10-267-000774–781; 10-267-000786–789; 10-267-000792; 10-267-000886–887; 10-267-000988; 10-267-001047; 10-267-001048; 10-267-001117; 10-267-001151; 10-267-001152; 10-267-001153; 10-267-001164; and 10-267-001172.  *See* Ex. 1 to Joint Statement [Dkt. # 23-1].

With regard to the second condition, the Supreme Court has determined that:

> [T]hose privileges include the privilege for attorney work-product and what is sometimes called the "deliberative process" privilege. Work product protects "mental processes of the attorney," while deliberative process covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.

*Id.* (internal citations omitted); *accord Schlefer v. United States*, 702 F.2d 233, 237 (D.C. Cir. 1983).

"The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery," and the goal behind its exemption "is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government." *Klamath Water*, 532 U.S. at 8–9 (internal citations omitted). The deliberative process privilege, however, only "protects agency documents that are *both* predecisional and deliberative." *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006) (emphasis added).

### a. The Deliberative Process Privilege

The Board claims that the sixty-two redacted or withheld records constitute intra-agency memoranda or letters and are properly withheld under the deliberative process privilege. McKinley does not contest that the records are intra-agency memoranda or letters within the

meaning of Exemption 5.   Instead, he contends that the records are factual rather than deliberative.[14]

McKinley's argument, however, is foreclosed by the opinion of another court in this district, *McKinley v. FDIC*, 744 F. Supp. 2d 128 (D.D.C. 2010), which was upheld on appeal in *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331 (D.C. Cir. 2011).   Two years prior to the instant litigation, McKinley filed a similar FOIA request seeking information relating to the Board's decision to invoke section 13(3) of the Federal Reserve Act and authorize the FRBNY to extend credit to Bear Stearns.   *McKinley*, 744 F. Supp. 2d 128.   The Board redacted or withheld certain records under the deliberative process privilege and McKinley challenged those withholdings on the theory that "factual material" is outside the scope of Exemption 5 because it does not "reveal any deliberations or judgment calls by Board officials." *Id.* at 138 (internal quotation marks omitted).   The district court rejected McKinley's argument,

---

14     McKinley also asserts that certain of the redacted or withheld records are not predecisional because the Board "fails to affirmatively assert" that the withheld material was not "formally or informally adopted."  Pl.'s Cross-Mot. at 14.   However, it is McKinley's and not the Board's burden to establish that predecisional records have been adopted as policy.  *See, e.g.*, *Mayer, Brown, Rowe and Maw, LLP v. IRS*, 537 F. Supp. 2d 128, 134-35 (D.D.C. 2008); *Trans Union LLC*, 141 F. Supp. 2d at 70-71. McKinley offers no evidence, nor cites to any evidence in the record, that would support a finding that any of the records at issue have been adopted as policy.  Because he fails to meet his burden, McKinley's argument is without merit. Additionally, McKinley alleges that Exemption 5 protects only those communications between persons in a "subordinate-superior relationship" and does not protect communications among "equals."  Pl.'s Cross-Mot. at 12, 22.   However, the underlying employment relationship between the persons engaged in communication is not dispositive in a court's determination as to whether a communication contains information protected by Exemption 5.   The controlling factor remains whether the communication contains information that is both predecisional and deliberative.  *See, e.g.*, *Gold Anti-Trust Action Comm., Inc. v. Board of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 137–38 (D.D.C. 2011) (applying Exemption 5 to, *inter alia*, two emails among Board staff).   As such, the Court rejects McKinley's *per se* argument that communications among equals are never protected from disclosure under the deliberative process privilege and finds that the Board's uncontroverted declarations establish that the communications at issue fit squarely within Exemption 5.   *See* Ex. I to Thro. Decl; Ashton Decl. ¶¶ 16, 20.

finding that "disclos[ure of] the withheld factual material would reveal the Board's deliberative process." *Id*. at 140. "[T]he work of Board and FRBNY staff in reaching out and culling certain financial statistics and exposure data, and the identities of certain financial institutions, for consideration by the Board from the mass of data available to it is itself deliberative." *Id*. (internal quotation marks omitted). Moreover, "disclosure of the requested factual summar[y] prepared [for] decisionmakers would expose [the Board's] decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Id*. (internal quotation marks omitted). The D.C. Circuit affirmed this decision on appeal. *See McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d at 339–40. Although the Circuit Court did not expressly address whether purely factual material falls within Exemption 5, it found that *all* of the withheld records in that case – including those containing purely factual matter such as financial statistics, pricing and exposure data, and the identities of various financial institutions – fit squarely within Exemption 5. *Id*.

Here, as in his previous lawsuit, McKinley argues that the withheld material is "purely factual" and therefore not deliberative. Pl.'s Cross–Mot. at 14; *see, e.g.*, Pl.'s Cross–Mot. at 17, 19, 21–25. And, just as in that case, the record here demonstrates that Board and FRBNY staff culled selected facts and data from the mass of available information regarding AIG and Lehman Brothers so as to assist the Board in its decision making process. *See, e.g.*, Ashton Decl. ¶ 7 ("Federal Reserve officials sought to form an opinion about the extent of the financial pressures facing [AIG],about the availability and effectiveness of any financial assistance from the private sector to resolve those pressures, about the availability and effectiveness of any regulatory relief the company may receive from the supervisors of its insurance operations, and the potential for widespread effects on the financial system and economy in general from AIG's financial troubles

and possible collapse."); *id*. ¶ 8 ("[t]he purpose of this analysis was to assist and advise the Board members with regard to any decision they may make. . . ."); Parkinson Decl. ¶ 10 ("Board members and staff requested information and advice from . . . the FRBNY in order to assist the Board in weighing options and considering possible responses to Lehman Brothers' capital and liquidity crisis . . . [including] information regarding other financial firms and markets which was critical to the Board's decision making process.").

Absent evidence in the record that would controvert the Board's declarations, the Court accords them a presumption of good faith and finds that the factual materials redacted or withheld in the sixty-two records were deliberative within the meaning of Exemption 5.  *In camera* inspection confirms that the disputed records contain a mix of factual material and analysis in the form of spreadsheets, emails, and memoranda.  Because McKinley's sole argument for disclosure rests on the flawed assumption that factual material is not deliberative, the Court finds each of the sixty-two redacted or withheld records to be protected from disclosure under FOIA Exemption 5.[15]  As such, McKinley's request to produce them will be denied.

---

15      Additionally, the Board claims that a small number of the sixty-two records redacted or withheld under the deliberative process privilege are also protected from disclosure pursuant to the attorney–client privilege.  The attorney-client privilege protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice."  *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 114 (D.D.C. 2005), quoting *Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977).  "Although it principally applies to facts divulged by a client to his attorney, this privilege also encompasses any opinions given by an attorney to his client based on, and thus reflecting, those facts as well as communications between attorneys that reflect client-supplied information."  *Id.*, citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980).  McKinley challenges the application of the attorney–client privilege to six of these records.  Having found these records properly withheld under the deliberative process privilege, however, the Court need not address McKinley's arguments under the attorney–client privilege.  Nonetheless, the Court would find that the attorney–client privilege applies here because the Board's uncontroverted declarations establish that each of the

4.   Records Redacted or Withheld Under Exemption 8

Finally, McKinley challenges the Board's withholding of two records under Exemption 8.[16]  FOIA Exemption 8 provides that an agency may withhold information that is "contained in or related to examination, operating or condition reports prepared by, or on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions[.]"   5 U.S.C. § 552(b)(8).  The exemption serves two purposes:

> (1) to ensure the security of financial institutions by eliminating the risk that disclosure of examination, operation, and condition reports containing frank evaluations of the investigated banks that might undermine public confidence and cause unwarranted runs on banks; and (2) to safeguard the relationship between the banks and their supervising agencies because if details of the bank examinations were made freely available to the public and to banking competitors, banks would cooperate less than fully with federal authorities.

*McKinley v. F.D.I.C.*, 744 F. Supp. 2d at 142–43 (D.D.C. 2010)

Although FOIA exemptions are generally construed narrowly, *DOJ v. Julian*, 486 U.S. 1, 8 (1988), it is well-established that the scope of Exemption 8 is "particularly broad," *Consumers Union of U.S., Inc. v. Heimann*, 589 F.2d 531, 533 (D.C. Cir. 1978).   The D.C. Circuit considered FOIA Exemption 8 for the first time in *Consumers Union* and concluded that "[i]f the Congress has intentionally and unambiguously crafted a particularly broad, all-inclusive definition, it is not our function, even in the FOIA context, to subvert that effort."  *Id.* at 533.

McKinley does not contest the Board's assertion that Exemption 8 protects information obtained from supervised financial entities.  Pl.'s Cross–Mot. at 20, 22.  Instead, he alleges only

---

six records at issue is a protected communication conveying legal advice between parties protected by the attorney-client relationship.  *See* Parkinson Decl. ¶ 17; Thro. Decl. ¶¶ 30–32.

16     The Bates ranges for the two records challenged under Exemption 8 are: 10-267-000349–353 and 10-267-000782.  McKinley does not address the Board's Exemption 8 argument for record 10-267-000799, so the Court treats that argument as conceded.  *See Fischer*, 723 F. Supp. 2d at 110; *Hopkins*, 284 F. Supp. 2d at 25.

that the Board failed to clearly articulate whether records 10-267-000349–353 and 10-267-000782 actually contain information from supervised financial entities. *Id.* Characterizing the Board's purported justifications as vague, McKinley asserts that he is entitled to disclosure. *Id.*

The Vaughn index, however, plainly describes that the Board redacted or withheld the two records at issue because they contain information from supervised financial entities. Record 10-267-000349–353 is described as "contain[ing] information obtained by FRB and/or Board supervisory staff *from supervised LFIs, financial utilities or clearing banks* . . . in order to assess the risks to supervised financial institutions of a possible Lehman bankruptcy." Ex. I to Thro. Decl. at 24, 43 (emphasis added). Likewise, record 10-267-000782 is described as the continuation of an email "contain[ing] information [that] was obtained by the Board or, its delegee, the FRBNY, as a result of its oversight authority over financial institutions." Ex. J to Thro. Decl. at 39–40, 69. Such information was "collected by the Board and FRBNY in a supervisory capacity *from regulated payment, clearing and settlement systems* . . . ." Stehm Decl. ¶ 7 (emphasis added).

In light of these declarations, the Court finds that the Board has "demonstrate[d] that the information withheld logically falls within [Exemption 8]." *Casey*, 656 F.2d at 738. As the Court has already mentioned, agency declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims," *SafeCard Servs., Inc.*, 926 F.2d at 1200, and McKinley points to no evidence that would controvert the Board's declarations, nor any evidence of agency bad faith, *see Casey*, 656 F.2d at 738. *In camera* review confirms that the disputed records contain properly exempted information from supervised financial entities. The Court finds that records 10-267-000349–353 and 10-267-000782 were properly redacted or withheld under FOIA Exemption 8, and McKinley's request to produce them will be denied.

25

IV.      **Conclusion**

Finding that the Board has conducted adequate searches and properly invoked FOIA Exemptions 4, 5, and 8, the Court will grant the Board's June 8, 2011 [Dkt. # 13] and July 15, 2011 [Dkt. # 17] motions for partial summary judgment and will deny McKinley's cross-motion for summary judgment [Dkt. # 19].  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  March 29, 2012